# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **DEANNA DENISE POPE,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:15cv00001 |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **REPORT AND RECOMMENDATION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

## I. Background and Standard of Review

Plaintiff, Deanna Denise Pope, ("Pope"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642

(4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Pope protectively filed an application for DIB on November 7, 2011, alleging disability as of May 4, 2010, due to muscle spasm; mononeuropathy in both hands; cervical radiculopathy; neck pain; cervical herniated nucleus pulposus, ("HNP"), without myelopathy; cervical and lumbar degenerative disc disease; lumbar HNP; low back pain; cervical stenosis; headaches; bilateral arm weakness; arm pain; shoulder pain; depression; and difficulty sleeping. (Record, ("R."), at 160-63, 172, 176, 207, 230.) The claim was denied initially and on reconsideration. (R. at 75-79, 83, 85-87, 89-91.) Pope then requested a hearing before an administrative law judge, ("ALJ"), (R. at 92-93.) A hearing was held by video conferencing on July 24, 2013, at which Pope was represented by counsel. (R. at 29-51.)

By decision dated August 20, 2013, the ALJ denied Pope's claim. (R. at 12-21.) The ALJ found that Pope met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2015.[1] (R. at 14.) The ALJ also found that Pope had not engaged in substantial gainful activity since May 4, 2010, the alleged onset date. (R. at 14.) The ALJ found that the medical evidence established that Pope suffered from a combination of severe impairments, namely neck pain; status-post cervical fusion; back pain; muscle spasms; mild carpal tunnel syndrome; and poor concentration secondary to pain, but he found that Pope did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14-17.) The

[1] Therefore, Pope must show that she was disabled between May 4, 2010, the alleged onset date, and August 20, 2013, the date of the ALJ's decision, in order to be eligible for DIB benefits.

ALJ also found that Pope had the residual functional capacity to perform light work[2] that required no more than occasional stooping, climbing of ramps and stairs and reaching, no climbing of ladders, ropes or scaffolds, no crawling, no more than frequent balancing, kneeling and crouching, which did not require concentrated exposure to vibration and hazards, and which was limited to the performance of one- to two-step instructions. (R. at 17-20.) Thus, the ALJ found that Pope was unable to perform any past relevant work. (R. at 20.) Based on Pope's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that there were other jobs available that Pope could perform, such as an usher, a tanning salon attendant and a school bus monitor. (R. at 20-21.) Therefore, the ALJ found that Pope was not under a disability as defined under the Act and was not eligible for benefits. (R. at 21.) *See* 20 C.F.R. § 404.1520(g) (2015).

After the ALJ issued his decision, Pope pursued her administrative appeals, (R. at 8), but the Appeals Council denied her request for review of the ALJ's decision. (R. at 1-5.) Pope then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2015). The case is before this court on Pope's motion for summary judgment filed June 15, 2015, and on the Commissioner's motion for summary judgment filed July 17, 2015. Neither party has requested oral argument.

## II. Facts

Pope was born in 1966, (R. at 160), which classified her as a "younger person" at the time of the ALJ's decision. *See* 20 C.F.R. § 404.1563(c) (2015).

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b)(2015).

She has a high school education with a couple of semesters of college instruction. (R. at 177, 32-33.)  She has past relevant work experience as a detention/correction officer, a housekeeper/nanny and a secretary.  (R. at 178.)

Pope testified that she last worked on May 4, 2010, as a detention officer, a job which she held for six years.  (R. at 33.)  She stated that she had other past work experience as a secretary in two different prison facilities and as a nanny and housekeeper.  (R. at 33-34.)  Pope stated that she was in a motor vehicle accident in August 2009, ultimately resulting in cervical fusion surgery in June 2010, but she continued to have neck problems as a result of this accident.  (R. at 34-35.) Pope stated that she experienced pain throughout the day, including muscle spasms and pain radiating into her shoulders.  (R. at 39-40.)  She also testified that she had weakness, numbness and decreased strength in her upper extremities and a limited range of motion in her neck.  (R. at 41-42.)  Pope testified that lifting, bending and holding her neck up were difficult for her and that such activities, in addition to reaching and walking, sitting or standing for extended periods, worsened her pain and that holding her arms up caused numbness.  (R. at 36, 41.)

Pope testified that she took pain medications and muscle relaxers at night because they made her sleepy.  (R. at 36-37.)  She testified that she also had undergone physical therapy, had used a transcutaneous electrical nerve stimulation, ("TENS"), unit, had tried various other medications and had received injections in her neck in an effort to relieve her symptoms.  (R. at 40.)  However, she stated that she had not had an injection since June 2012 due to a spinal meningitis scare.  (R. at 40.)  Pope stated that use of a heating pad, massages, frequent rest periods and lying down throughout the day helped relieve her pain.  (R. at 41-42.)

In addition to her neck problems, Pope stated that she experienced daily

headaches, sometimes requiring her to lie down.  (R. at 42.)  She also testified that she had mild carpal tunnel syndrome in both wrists, causing arm weakness, numbness and tingling, swelling of the tops of her hands and muscle spasms in her hands.  (R. at 42-43.)  She stated that, if she lifted more than a couple of pounds, her hands hurt, as well as her neck, and that she had dropped a couple of casseroles.  (R. at 43.)

Pope testified that her daily activities included making breakfast, which could be as simple as cereal or something homemade like biscuits, doing light laundry, watching television, making lunch, sitting outside in the sun to get some Vitamin D, occasionally walking to a neighbor's house, preparing supper, washing her husband's work uniform for the next day and helping her young grandchildren, of whom she and her husband had custody, get ready for bed.  (R. at 37-38, 47.)  She stated that, if she was going to be cooking the next day, she would start preparing things.  (R. at 38.)  Pope testified that she sometimes attended church services.  (R. at 39.)  She stated that she and her husband cleaned their house, but he did most of the heavy cleaning.  (R. at 45.)  She stated that her husband also did most of the driving.  (R. at 46.)  Pope testified that she used to ride a jet ski, ski and play ball, but she was afraid to do those things for fear of reinjuring herself, resulting in even less mobility.  (R. at 46.)

Vocational expert, Mark Hileman, also testified at Pope's hearing. (R. at 47-50.)  Hileman classified Pope's work as a detention/corrections officer as medium[3] and semi-skilled, as a secretary as sedentary[4] and skilled and as a

---

[3] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds.  If an individual can do medium work, she also can do light and sedentary work.  *See* 20 C.F.R. § 404.1567(c) (2015).

[4] Sedentary work involves lifting items weighing no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools.  Although a

housekeeper/nanny as medium and semi-skilled, but, as performed by Pope, at the light exertional level.  (R. at 48-49.)  When Hileman was asked to consider a hypothetical individual of Pope's age, education and work experience, who would be limited to light work that did not require the climbing of ladders, ropes or scaffolds or crawling, that required no more than occasional climbing of ramps and stairs, stooping and reaching, that did not require concentrated exposure to vibrations and hazards and that required the performance of no more than one- to two-step job instructions, he testified that such an individual could not perform Pope's past relevant work, but could perform jobs existing in significant numbers in the national economy, including those of an usher, a tanning salon attendant and a school bus monitor.  (R. at 49-50.)  Hileman next was asked to consider a hypothetical individual who could lift and carry items weighing no more than three pounds, who could stand and/or walk less than two hours and sit less than two hours in an eight-hour workday, who could occasionally stoop and crouch, but never twist, and who must avoid all exposure to extreme cold, wetness, humidity, noise, fumes, odors, dust, gases, poor ventilation and hazards.  (R. at 50.)  Hileman testified that such an individual could not perform any work.  (R. at 50.)

In rendering his decision, the ALJ reviewed medical records from Internal Medicine Associates of Southwest Virginia; Norton Community Hospital; Highlands Pathology; Holston Valley Hospital; Wellmont Holston Valley Medical Center; Blue Ridge Neuroscience Center, P.C.; Mountain View Regional Medical Center; Medical Associates of Southwest Virginia; Wise Medical Group; Associated Neurologists of Kingsport; Internal Medical Associates of Norton; Pain Medicine Associates; Kingsport Day Surgery; Dr. Souhail Shamiyeh, M.D.; Norton Diagnostic Imaging; Appalachian After Hours Care; Cutting Edge

---

sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  *See* 20 C.F.R. § 404.1567(a) (2015).

Dermatology; Dr. Richard Surrusco, M.D., a state agency physician; Dr. Andrew Bockner, M.D., a state agency physician; Dr. John Sadler, M.D., a state agency physician; and Surgical Associates of Kingsport.

The record shows that Pope presented to the emergency department at Norton Community Hospital, ("Norton Community"), on September 27, 2009, with complaints of back and neck pain after being involved in a motor vehicle accident on August 31, 2009, for which she had received no treatment. (R. at 292, 296.) Pope also reported pain shooting into the right leg, as well as pain in the left flank area. (R. at 296.) She received a Toradol injection, and Dr. Christopher Smith, D.O., ordered x-rays of the cervical, lumbar and thoracic spine. (R. at 293, 300-01.) Lumbar spine x-rays showed mild degenerative changes, thoracic spine x-rays showed no evidence of compression deformity or spondylolisthesis, but minimal thoracic spur formation, and cervical spine x-rays showed reversal of the normal lordotic curvature. (R. at 280-82, 466-67, 469.) Dr. Smith diagnosed Pope with a strain of the cervical, thoracic and lumbosacral spine, he prescribed Flexeril and naproxen, and he advised her to follow up with her primary care physician within two to three days. (R. at 295, 301-02.)

Pope saw April Stidham, F.N.P.,[5] a family nurse practitioner for Dr. Souhail Shamiyeh, M.D. at Medical Associates of Southwest Virginia, on October 1, 2009, with complaints associated with the August 2009 motor vehicle accident. (R. at 564.) She had decreased range of motion of the neck and tenderness to the cervical spine and trapezius muscle. (R. at 564.) Stidham diagnosed possible sciatica and prescribed Naprosyn. (R. at 564.)

---

[5] The treatment notes from Stidham and Dr. Shamiyeh are handwritten and quite difficult to decipher. The court has done its best in this regard.

Pope was seen at Mountain View Regional Medical Center Outpatient Rehabilitation Services for an initial physical therapy evaluation for her back, neck and shoulders on October 14, 2009. (R. at 475.) She received physical therapy services through November 2009. (R. at 475-91.) Over this time, Pope was treated with moist heat, ultrasound, electrical stimulation and therapeutic exercises. She experienced some therapy-related soreness, but by November 2009, she had improved left cervical spine rotation, decreased pain and improved flexibility. (R. at 478, 490-91.)

On October 23, 2009, Stidham noted that physical therapy had improved Pope's condition, as she had a full range of motion of the neck without cervical spine tenderness. (R. at 563.) On February 3, 2010, Dr. Shamiyeh referred Pope to a neurosurgeon. (R. at 562.) She returned to Dr. Shamiyeh on March 1, 2010, with complaints of neck stiffness. (R. at 561.) He diagnosed low back pain and neck pain. (R. at 561.) On March 18, 2010, Pope continued to have a decreased range of motion of the neck without cervical or lumbar spine tenderness, and Stidham diagnosed neck and low back pain and scheduled an MRI of both areas. (R. at 560.)

An MRI of the lumbar spine, dated April 1, 2010, showed degenerative disc disease without focal disc herniation or significant central canal stenosis. (R. at 279, 289, 462.) An MRI of the cervical spine, taken the same day, showed right lateral focal disc herniation at the C5-C6 level, effacing the subarachnoid space and distorting the right anterolateral cervical cord, as well as mild degenerative disc disease. (R. at 278, 287, 464.) On April 15, 2010, Pope exhibited right-sided neck tenderness and cervical spine tenderness on palpation, Stidham diagnosed a cervical spine disc herniation and referred her to Dr. Austin. (R. at 559.)

On May 4, 2010, Pope saw Dr. Rebekah C. Austin, M.D., a neurosurgeon at Blue Ridge Neuroscience Center, P.C., for an initial consultation regarding cervical pain. (R. at 425-28.) Pope reported neck pain, stiffness, decreased range of motion, low back pain, right lower extremity pain and generalized upper extremity weakness. (R. at 425.) She reported continually worsening symptoms, but some range of motion improvement after a course of physical therapy. (R. at 425.) Pope appeared to be in no acute distress. (R. at 426.) She had no edema of the lower extremities, mild paraspinous muscle contractions and tenderness of the lumbar and cervical spine. (R. at 426-27.) Range of motion of the head and neck was limited on left rotation to 65 degrees and on right rotation to 55 degrees. (R. at 427.) Range of motion of the spine, ribs and pelvis was limited on flexion to 70 degrees, but there was no limitation of motion of any of the extremities. (R. at 427.) There was an increase in muscle tone of the trapezius musculature and paraspinal musculature. (R. at 427.) The right upper bicep had 4+ strength, but strength was full, tone was normal, and no atrophy was noted in the head, neck, left upper extremity or bilateral lower extremities. (R. at 427.) Neurological examination was normal. (R. at 427.) Dr. Austin diagnosed Pope with a cervical HNP without myelopathy; cervical stenosis; neck pain; cervical degenerative disc disease; lumbar HNP, broad-based at the L4-L5 and L5-S1 levels; lumbar radiculopathy at the right L5 level; and low back pain. (R. at 427.) She ordered cervical and lumbar myelograms and post-myelographic CT scans. (R. at 428.)

The cervical myelogram, performed on May 12, 2010, showed a broad-based right-sided disc extrusion at the C5-C6 level with moderate right anterior cord compression and right C6 nerve root compression. (R. at 453.) There also was a small central protrusion at the C6-C7 level with no cord or nerve root compression. (R. at 453.) Cervical x-rays showed no spinal instability with flexion and extension. (R. at 454.) A post-myelographic CT scan showed a disc bulge,

slightly larger to the left, at the L4-L5 level with mild left L5 nerve root compression, as well as a left foraminal spur at the L5-S1 level, abutting the left L5 nerve root with questionable nerve root compression. (R. at 455.) A lumbar myelogram from the same day showed minor anterior extradural defects at the L4-L5 and L5-S1 levels and minimal lateral recess narrowing bilaterally at the L4-L5 level. (R. at 459, 625.) X-rays of the lumbar spine showed no instability with flexion and extension. (R. at 460.)

On May 18, 2010, Pope reported neck spasms, low back pain and right lower extremity pain, as well as headaches, but she did not appear to be in any acute distress. (R. at 421.) Her gait was antalgic on the right. (R. at 422.) Her physical examination remained unchanged, as did Dr. Austin's diagnoses of Pope. (R. at 422-23.) Dr. Austin recommended proceeding with cervical surgery, to which Pope agreed. (R. at 423.)

When Pope saw Dr. David Pryputniewicz, M.D.,[6] at Blue Ridge Neuroscience Center, P.C., on June 1, 2010, she reported neck pain and spasms, low back pain and right lower extremity pain, as well as headaches. (R. at 417.) Pope was in no acute distress. (R. at 417.) Her physical examination and diagnoses again remained the same, and she confirmed her desire to proceed with surgery. (R. at 417-19.) On June 2, 2010, Pope underwent a cervical spinal fusion with diskectomy and arthrodesis to correct the C5-C6 level HNP by Dr. Pryputniewicz. (R. at 326, 329-32, 382-88.)

At a post-operative visit with Dr. Pryputniewicz on June 8, 2010, Pope reported muscle spasms and neck pain, as well as headaches and sleep disturbance

---

[6] It was noted that, due to a recent illness of Dr. Austin, Pope had elected to proceed with surgery under the direction of Dr. Pryputniewicz. (R. at 416.)

due to ongoing symptoms. (R. at 413-15.) Pope's gait was nonantalgic, but she had moderate cervical paraspinous muscle contractions, increased muscle tone in the trapezius, as well as paraspinal musculature, and 5- strength in the right bicep and tricep. (R. at 414.) There was no asymmetry, crepitation, tenderness, masses, deformities or effusions noted. (R. at 414.) An examination of the head and neck revealed rigid cervical collar intact, and strength was full, tone was normal, and no atrophy was noted in the left upper extremity. (R. at 414.) Dr. Pryputniewicz diagnosed a cervical HNP without myelopathy at the C5-C6 level on the right, post-op; cervical stenosis at the C5-C6 level, post-op; neck pain, stable; cervical degenerative disease at the C5-C6 level; a broad-based lumbar HNP at the L4-L5 and L5-S1 levels; lumbar radiculopathy at the L5 level on the right; and low back pain. (R. at 414-15.) He prescribed Valium for muscle spasms. (R. at 415.) Cervical x-rays from that date showed expected immediate post-operative findings. (R. at 446-47.)

When Pope returned to Dr. Pryputniewicz on July 13, 2010, she reported increased neck pain and stiffness after striking her head on a camper earlier that month. (R. at 410-12.) She also complained of continued generalized weakness of the upper extremities, but improved radiating pain in the upper extremities. (R. at 410.) She denied any specific muscle group weakness or gait abnormalities. (R. at 410.) Pope's gait remained nonantalgic, but she had moderate cervical paraspinous muscle contractions, increased muscle tone in the trapezius and paraspinal musculature and 5- strength globally in the upper extremities with giveaway weakness secondary to pain. (R. at 411.) However, strength was 5+, tone was normal, and no atrophy was noted in the lower extremities. (R. at 411.) Dr. Pryputniewicz noted that cervical x-rays revealed bone graft and plating in good position at the C5-C6 level with excellent progression of the fusion. (R. at 411, 445, 622.) Pope's diagnoses remained unchanged, Dr. Pryputniewicz prescribed

oxycodone-acetaminophen for pain and Valium for spasm, and she was scheduled for a six- to eight-week course of physical therapy. (R. at 411-12.)

Pope returned to Dr. Shamiyeh on August 16, 2010, at which time she had a decreased range of motion of the neck. (R. at 557.) She was diagnosed with low back pain. (R. at 557.) Pope began a course of physical therapy on July 21, 2010, continuing through November 12, 2010. (R. at 497-546.) On July 21, 2010, at her initial physical therapy evaluation, she was very reluctant to move and feared reinjuring her neck. (R. at 545.) Brandi Lawson, MPT, Master of Physical Therapy, assessed Pope as having decreased cervical range of motion, decreased shoulder flexibility, decreased upper extremity strength, difficulty sleeping and fear of movement. (R. at 546.) Over her course of treatment, Pope received moist heat, ultrasound, soft tissue massage, therapeutic exercises and electrical stimulation therapy. In August 2010, Pope exhibited increased cervical range of motion, slight improvement in rotation range of motion, increased strength in both upper extremities and decreased muscle tension in her neck and bilateral trapezius areas. (R. at 504-10.) In September 2010, Pope reported soreness from the cervical exercises, increased muscle tension at the left upper thoracic area and a fear that she might have "pulled something" during home exercises. (R. at 523-25.) However, by September 21 and September 28, 2010, Pope reported that she was doing better. (R. at 525-26.) In October 2010, she exhibited decreased tightness and pain and increasing cervical mobility. (R. at 532-38.) Her physical therapists noted that she was doing better overall and was progressing well. (R. at 534, 538.)

At a follow-up appointment with Dr. Pryputniewicz on August 24, 2010, Pope reported improvement in her neck pain and spasm with structured physical therapy, but continued to report pain and spasm in the cervical and trapezial region, as well as continued stiffness and decreased range of motion and generalized

weakness of the upper extremities. (R. at 407.) However, she could not identify any specific muscle group weakness. (R. at 407.) Pope had moderate cervical paraspinous muscle contractions and increased trapezius and paraspinal muscle tone. (R. at 408.) Strength was 5+, tone was normal, and no atrophy was noted in any of the extremities. (R. at 408.) Dr. Pryputniewicz's diagnoses of Pope remained unchanged. (R. at 408-09.) Continued physical therapy and home exercises were recommended. (R. at 409.)

On September 22, 2010, Dr. Shamiyeh continued to diagnose Pope with cervical pain. (R. at 556.) Pope returned to Dr. Pryputniewicz on October 12, 2010, with continued complaints of pain and spasm, primarily affecting the trapezial region, with associated stiffness and loss of range of motion of the cervical spine. (R. at 404-06.) She denied any gait disturbances, and she did not appear to be in any acute distress. (R. at 404-05.) Her gait was nonantalgic, she had moderate cervical paraspinous muscle contractions, both left and right rotation of the head and neck were limited to 65 degrees with increased pain, she had increased trapezius and paraspinal muscle tone, and she had 5- strength of the right deltoid with an element of give away weakness. (R. at 405.) There was no limitation of motion of any of the extremities, and Pope's strength was 5+, tone was normal, and no atrophy was noted in the left upper extremity or the bilateral lower extremities. (R. at 405.) Pope's diagnoses remained unchanged, and no changes were made in her treatment regimen. (R. at 405-06.) She was instructed to continue with a routine home exercise program and physical therapy. (R. at 406.) Cervical spine x-rays taken that day showed expected findings status-post anterior diskectomy with interbody fusion and plate fixation at the C5-C6 level. (R. at 443.)

On November 15, 2010, Pope continued to complain of neck pain, but noted that a TENS unit was helping some. (R. at 555.) Dr. Shamiyeh diagnosed neck

pain and low back pain. (R. at 555.) On February 8, 2011, Pope complained of significant neck pain and spasm that waxed and waned, depending on her activity level. (R. at 400.) She reported that she had discontinued the physical therapy due to increasing spasm. (R. at 400.) Pope reported difficulty working with her arms extended or above her head due to progressive neck and trapezial pain. (R. at 400.) Dr. Pryputniewicz noted that Pope had continued posterior cervical pain radiating into the trapezial region, right greater than left. (R. at 400.) She denied any specific muscle weakness or gait abnormality, but reported difficulty carrying out her usual activities due to her progressive pain syndrome, noting that even minimal activity tended to exacerbate her symptoms. (R. at 400.) Pope did not appear to be in any acute distress, and her gait was nonantalgic. (R. at 401.) Her physical examination and Dr. Pryputniewicz's diagnoses of her remained the same. (R. at 401-02.) Dr. Pryputniewicz ordered a cervical myelogram and post-myelographic CT scan, which were performed on February 11, 2011, and showed an intact C5-C6 level anterior interbody fusion, posterior spurring and minor disc protrusion or disc bulge at the C6-C7 level without evidence of cord or nerve root compression. (R. at 353-54, 368, 393-94, 402, 436-40.) This testing further showed a left parasagittal C6-C7 level disc protrusion abutting the ventral root of the eighth cervical nerve as it exited the spinal cord. (R. at 354, 368, 393, 436, 441.) Cervical spine x-rays showed no evidence of mechanical instability, but limited range of motion. (R. at 355, 369, 394, 436-37, 444.)

When Pope presented to Appalachian After Hours Care on January 22, 2011, with complaints of sinus congestion and drainage, she exhibited cervical tenderness. (R. at 713.)

On February 18, 2011, Pope's complaints and her physical examination were unchanged. (R. at 396-99.) Dr. Pryputniewicz noted that the cervical

myelogram with post-myelographic CT scan showed post-surgical changes, a prior surgical fusion at the C5-C6 level, with excellent progression of the fusion, disc degeneration and a small disc protrusion not impinging on the nerve root at the C6-C7 level. (R. at 398.) Pope's diagnoses remained unchanged, and Dr. Pryputniewicz noted no indication for consideration of surgical intervention. (R. at 398.) However, Dr. Pryputniewicz referred her to Dr. Pendola, a neurologist, for further consideration of Botox injections. (R. at 398.)

On February 24, 2011, Stidham diagnosed Pope with neck pain, for which she received a Nubain injection. (R. at 554.) On October 13, 2011, Pope reported continued low back pain. (R. at 585.)

Pope saw Dr. Christopher A. Pendola, M.D, a neurologist at Associated Neurologists of Kingsport, from March 31 through November 10, 2011. (R. at 641-53.) On March 31, 2011, she complained of muscle spasm and headaches with decreased mobility of the cervical spine. (R. at 647-51.) She reported that she had experienced persistent neck pain and muscle spasm, which came and went, since her June 2010 cervical surgery. (R. at 647.) Pope stated that Valium was somewhat helpful, but physical therapy tended to exacerbate her symptoms, as did lifting items and rotating her head to either side. (R. at 647.) On physical examination, motor strength was normal, there was no atrophy of the upper extremities, and sensation was intact throughout. (R. at 650.) Gait and station were within normal limits, there was no dystaxia,[7] apraxia[8] or festination,[9] and tandem walk was

---

[7] Dystaxia refers to difficulty controlling voluntary movements. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 521 (27th ed. 1988).

[8] Apraxia refers to the loss of ability to carry out familiar, purposeful movements in the absence of paralysis or other motor or sensory impairment, especially inability to make proper use of an object. *See* Dorland's at 116.

performed normally. (R. at 650.) Reflexes were symmetric and within physiologic limits, and plantar cutaneous stimulation produced flexor responses bilaterally. (R. at 650.) An examination of the neck revealed very mild laterocollis[10] toward the right side at times and some mild hypertonicity of the cervical paravertebral muscles and middle trapezius muscles. (R. at 650.) There was no titubation,[11] and no clubbing, cyanosis or edema of the extremities was noted. (R. at 649-50.) Dr. Pendola diagnosed Pope with status-post whiplash injury; status-post anterior cervical diskectomy and fusion at the C5-C6 level; and muscle spasm and tension headaches involving the cervical paravertebral muscles and trapezius muscles with a very mild element of a laterocollis on the exam date. (R. at 650.) He prescribed Zanaflex and Flector patches, and he referred Pope for a physical therapy consult for a TENS unit. (R. at 651.)

When Pope saw Dr. Pendola on May 12, 2011, she reported that the TENS unit had been somewhat helpful, as had the Zanaflex and the Flector patches, but she could only take the Zanaflex at night, as it made her sleepy. (R. at 645-46.) She also stated that the TENS unit caused her to see black flashes of light. (R. at 645.) Pope reported continued bilateral arm weakness, and she noted that picking up a casserole dish intensified her neck pain, and she felt as if she would drop things. (R. at 645.) Her physical examination was essentially the same as previously, but Dr. Pendola noted a taut muscle band within the left middle

---

[9] Festination is an involuntary tendency to take short accelerating steps in walking, as in paralysis agitans and other neurologic diseases. *See* Dorland's at 619.

[10] Laterocollis is a type of cervical dystonia in which the head is pulled to one side and down to the shoulder. The individual has difficulty maintaining the head in a central position and has even more difficulty turning the head to the other side. *See* http://brainfoundation.org.au/disorders/cervical-dystonia (last visited March 8, 2016).

[11] Titubation refers to a staggering or stumbling gait with shaking of the trunk and head, commonly seen in cerebellar disease. *See* Dorland's at 1726.

trapezius muscle and tenderness to the cervical paravertebral muscles to palpation. (R. at 646.) In addition to his previous diagnoses, Dr. Pendola diagnosed post-traumatic cervical dystonia, characterized by mild laterocollis toward the right side and some mild muscle spasm; and photopsia.[12] (R. at 646.) He continued her on Zanaflex and Flector patches, and he referred her to an ophthalmologist for her vision complaints. (R. at 646.) He also scheduled an EMG/nerve conduction study in light of her persistent arm pain and weakness. (R. at 646.) This study was conducted on May 13, 2011, and the findings were consistent with very mild median nerve mononeuropathies at each wrist without evidence of active radiculopathy, as well as a cervical dystonia. (R. at 652-53.) On August 16, 2011, Pope advised Dr. Pendola that her neck was doing "about the same," and she had not experienced any radicular symptoms. (R. at 643.) Pope appeared to be quite comfortable. (R. at 644.) On physical examination, Pope's neck was supple, and there was no laterocollis, torticollis[13] or retrocollis.[14] (R. at 644.) Gait and station appeared normal, as did motor strength. (R. at 644.) Dr. Pendola did not appreciate any cervical paravertebral muscle spasm, sensation was intact throughout, and there were no stigmata of regional pain syndrome. (R. at 644.) Dr. Pendola's diagnoses of Pope remained the same, except he noted that the right-sided laterocollis had resolved. (R. at 644.) He prescribed Neurogel Plus for musculoskeletal pain and continued her on Zanaflex. (R. at 644.)

On November 10, 2011, Pope advised Dr. Pendola that the Neurogel helped

---

[12] Photopsia is an appearance as of sparks or flashes due to retinal irritation. *See* Dorland's at 1288.

[13] Torticollis is a contracted state of the cervical muscles, producing twisting of the neck and an unnatural position of the head. Torticollis also is known as wryneck. *See* Dorland's at 1734.

[14] Retrocollis is spasmodic wryneck, in which the head is drawn directly backward. *See* Dorland's at 1457.

her pain and relieved some of the tightness and discomfort. (R. at 641-42.) She reported continued neck pain, primarily on the right side, but she did not report any new neurological symptoms. (R. at 641.) Physical examination findings remained the same as previously, as did Dr. Pendola's diagnoses. (R. at 641-42.) He advised Pope to continue the Neurogel Plus and Zanaflex, and he referred her to a pain clinic for her neck pain. (R. at 642.)

On December 8, 2011, Pope saw Holly Broadwater, F.N.P., a family nurse practitioner at Pain Medicine Associates, P.C., for neck and bilateral shoulder pain. (R. at 663-67.) Pope described her pain as a throbbing, stabbing, constant discomforting pain which increased with sitting, standing, walking, bending, twisting, coughing and sneezing, and which was relieved by resting, medications, massage and TENS unit usage. (R. at 663.) Pope stated that she considered herself disabled from pain. (R. at 663.) On physical examination, she had tenderness to the cervical spine and right upper trapezius/scalene area, difficulty with flexion, extension and lateral rotation, and she exhibited some pain in the lumbar/sacral spine and in the bilateral hips with internal and external rotation. (R. at 663.) She had diminished sensation in the left lateral thigh compared to the right and some diminished sensation in the foot. (R. at 663.) However, gross motor strength in the lower extremities was 5+, reflexes in the upper extremities were 2++ bilaterally and symmetrical, and sensation was intact. (R. at 663.) Broadwater diagnosed cervical degenerative disc disease; cervical decompression, status-post fusion at the C5-C6 level; cervical myofascial pain, dystonia; and chronic pain syndrome, among other things. (R. at 664.) An appointment for a surface EMG was scheduled to delineate whether Pope's pain was mechanical versus musculoskeletal. (R. at 664.)

State agency physician, Dr. Richard Surrusco, M.D., completed a physical

assessment of Pope on December 29, 2011, in connection with her initial disability claim. (R. at 56-58.) Dr. Surrusco found that Pope suffered from a severe disorder of the spine and severe degenerative disc disease. (R. at 56.) He opined that Pope could perform light work that required no more than occasional climbing of ropes, ladders and scaffolds and stooping. (R. at 57.) Dr. Surrusco concluded that Pope could perform her past relevant work as an office service specialist. (R. at 60.)

Pope continued to treat with Broadwater through May 7, 2012. (R. at 662, 684-86.) Over this time, she agreed to try epidural steroid injections at Broadwater's suggestion. (R. at 662.) In January 2012, Pope had cervical spine tenderness and upper trapezius and scalene tenderness, but her reflexes were 2++ and symmetrical bilaterally. (R. at 662.) In March 2012, Pope reported two weeks of relief from a cervical epidural steroid injection. (R. at 684.) She exhibited cervical spine tenderness, but gross motor strength was intact. (R. at 684.) Broadwater ordered six weeks of physical therapy. (R. at 684.) By May 7, 2012, Pope reported that she experienced a lot of pain with her last injection, and Broadwater noted Pope's great fear of needles. (R. at 686.) Pope exhibited cervical spine tenderness, but gross motor strength was intact. (R. at 686.) Her diagnoses remained unchanged, and Broadwater advised her to return to the clinic if she wished to resume injection therapy. (R. at 686.)

Pope returned to Dr. Shamiyeh on February 3, 2012, with continued complaints of neck pain, backache and right knee pain. (R. at 657-60.) On physical examination, Pope had a decreased range of motion and tenderness in the paraspinal area, the lumbosacral spine area and the right knee. (R. at 658-59.) Dr. Shamiyeh diagnosed Pope with prepatellar bursitis of the right knee and referred her to an orthopedic surgeon, as well as neck pain, for which he continued Zanaflex. (R. at 659.)

On February 9, 2012, Pope underwent a cervical epidural steroid injection at Kingsport Day surgery by Dr. William Williams, M.D. (R. at 668-69.) She underwent another cervical epidural steroid injection on March 1, 2012. (R. at 676.) She was discharged in good condition. (R. at 676.)

When Pope returned to Dr. Shamiyeh on March 7, 2012, she was in no acute distress, she had a full range of motion of the neck and all extremities, as well as negative straight leg raise testing bilaterally. (R. at 692-93.) On March 8, 2012, Dr. Shamiyeh completed a work-related physical assessment, finding that Pope could lift and carry items weighing up to three pounds both occasionally and frequently. (R. at 680-83.) Dr. Shamiyeh further found that Pope could stand and walk less than two hours during an eight-hour workday and sit for less than two hours during an eight-hour workday. (R. at 680.) He found that Pope could sit and stand for 15 minutes without interruption before having to walk around for 15 minutes. (R. at 681.) Dr. Shamiyeh found that Pope also required the opportunity to shift at will from sitting or standing/walking and that she required the opportunity to lie down four to five times at unpredictable intervals during a work shift. (R. at 681.) He noted that such limitations were supported by Pope's bilateral carpal tunnel syndrome; her cervical fusion; cervical stenosis; lumbar HNP; low back pain; and upper extremity weakness. (R. at 681.) Dr. Shamiyeh found that Pope could never twist or climb ladders, but occasionally stoop (bend), crouch and climb stairs. (R. at 681-82.) He further found that Pope's abilities to reach, to handle and finger objects, to feel and to push/pull were affected by her impairment due to severe neck pain. (R. at 682.) Dr. Shamiyeh found that Pope must avoid all exposure to extreme cold, wetness, humidity, noise, fumes, odors, dusts, gases, poor ventilation and hazards. (R. at 682.) He noted that Pope's impairments or treatment would cause her to be absent from work on an "ongoing" basis. (R. at

683.)

On April 10, 2012, Dr. John Sadler, M.D., a state agency physician, completed a physical residual functional capacity assessment of Pope in connection with the reconsideration of her disability claim. (R. at 69-71.) Dr. Sadler found that Pope could perform light work that required no more than occasional climbing of ramps and stairs, as well as stooping, and which required no climbing of ladders, ropes or scaffolds, as well as crawling. (R. at 69.) Dr. Sadler further found that Pope was limited in her ability to push and/or pull with both upper extremities. (R. at 69.) He found that she was limited in her ability to reach overhead, as well as in front and/or laterally, with both arms. (R. at 70.) Dr. Sadler found that Pope should avoid concentrated exposure to vibration and hazards. (R. at 71.) He concluded that Pope could perform her past relevant work as an office service specialist. (R. at 72.)

Pope returned to Dr. Shamiyeh on June 14, 2012, with continued complaints of neck pain. (R. at 696.) On physical examination, she had a decreased range of motion and tenderness in the paraspinal area, the anterior neck area bilaterally, the lumbosacral spine and the right knee. (R. at 697-98.) Dr. Shamiyeh diagnosed osteopenia, as well as back and neck pain. (R. at 698-99.)

On July 6, 2012, Pope saw Samantha Addison, N.P., a nurse practitioner at Wellmont Medical Associates, with complaints of an upper respiratory infection. (R. at 744-46.) At that time, claudication, joint pain, muscle pain and muscle weakness were not present, and Pope was in no acute distress. (R. at 745.) She returned to Addison on February 6, 2013, with complaints of abdominal pain. (R. at 741-43.) Again, Pope was in no acute distress. (R. at 742.) She had full range of motion of the neck, which was nontender and without lymphadenopathy. (R. at

742.)

A CT scan of the abdomen, dated April 8, 2013, showed degenerative disc changes at the L5-S1 level and, to a lesser extent, the L4-L5 level of the spine. (R. at 817.) Pope presented to the emergency department at Norton Community on May 26, 2013, with complaints of abdominal pain. (R. at 832-38.) At that time, an examination of her neck was normal. (R. at 834.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2015); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2015).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Pope argues that the ALJ improperly assessed her credibility regarding her complaints of pain. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 3-12.) Pope further argues that the ALJ erred in his weighing of the medical evidence in determining her physical residual functional capacity assessment. (Plaintiff's Brief at 12-13.)

Based on my review of the record, I find both of Pope's arguments unpersuasive. She first argues that the ALJ improperly assessed her credibility regarding her complaints of pain. "[P]ain itself can be disabling, and it is incumbent upon the ALJ to evaluate the effect of pain on a claimant's ability to function." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989). The determination of whether a claimant is disabled by pain or other subjective symptoms is a two-step process under the Act. *See Craig v. Chater*, 76 F.3d 585, 594-96 (4th Cir. 1996); 20 C.F.R. § 404.1529(b),(c) (2015). First, there must be objective medical evidence showing the existence of an impairment which could reasonably be expected to produce the actual pain, in the amount and degree alleged by the claimant. *See Craig*, 76 F.3d at 594-96. Only after the existence of such an impairment is established must the ALJ consider the intensity and persistence of the claimant's pain and the extent to which it affects the ability to work. *See Craig*, 76 F.3d at 594-96. In making this evaluation, the ALJ must consider "all of the available evidence," including: (1) the plaintiff's history, including her own statements; (2) objective medical evidence, which is defined as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption[]"; and (3) other evidence submitted by the plaintiff relevant to the severity of the impairment such as evidence of daily activities, medical treatments and medications, as well as descriptions of the pain or other

symptoms. 20 C.F.R. § 404.1529(c)(1)(3) (2015). Although a claimant's allegations about pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence. *See Craig*, 76 F.3d at 595.

It is the province of the ALJ to assess the credibility of a witness or claimant. *See Hays*, 970 F.2d at 1456; *Taylor*, 528 F.2d at 1156. Furthermore, "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). Ordinarily, this court will not disturb the ALJ's credibility findings unless "it appears that [his] credibility determinations are based on improper or irrational criteria." *Breeden v. Weinberger*, 493 F.2d 1002, 1010 (4th Cir. 1974). Likewise, an ALJ's assessment of a claimant's credibility regarding the severity of pain is entitled to great weight when it is supported by the record. *See Shively*, 739 F.2d at 989-90. "When factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997) (quoting *N.L.R.B. v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). "Exceptional circumstances" are those where the ALJ's determination is "unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Eldeco, Inc.*, 132 F.3d at 1011 (citation omitted).

Here, the ALJ found that Pope's medically determinable impairments could reasonably be expected to cause her alleged symptoms, which included a limited range of motion of the neck, symptoms associated with mild bilateral carpal tunnel syndrome, an inability to stand, walk or sit for prolonged periods and the need to

rest throughout the day, among other things. (R. at 18.) However, the ALJ further found that Pope's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible for various reasons, which he explained in detail. (R. at 18.) For instance, he noted her wide range of reported daily activities, including serving as a stay-at-home caretaker for her grandchildren, of whom she and her husband had custody, as well as occasional visits to a neighbor, doing light laundry and occasionally attending church services. (R. at 18.) The ALJ also emphasized the essentially mild or benign findings on physical examinations, supported by objective medical testing, such as MRIs, CT scans and x-rays, as well as the essentially conservative treatment she received for her pain. (R. at 18-20.)

While Pope argues that, in order for the ALJ to consider her daily activities as contradictory to her allegations of disabling pain, they must be equivalent to full-time work, consuming a significant part of her day, I find that this is simply incorrect. (Plaintiff's Brief at 11, 13.) The Social Security Regulations specifically allow for the ALJ to consider a claimant's daily activities in assessing the credibility of pain allegations. *See* 20 C.F.R. § 404.1529(c)(3)(i) (stating that a claimant's daily activities is one of several factors to consider in assessing a claimant's credibility). Here, the ALJ found that Pope's activities of daily living, including caring for her two young grandchildren, preparing all meals, getting the grandkids off to school, washing light laundry, assisting with homework and attending sporting events, were contradictory to her allegations of disabling pain. (R. at 18-19, 37-38, 199-205.) Additionally, Pope acknowledged that she primarily cared for her grandchildren, as she testified that her husband usually worked until 7:00 p.m. (R. at 18, 37-38.) I find that, contrary to Pope's assertion, her reported daily activities amount to more than caring for herself, and, they arguably do consume a substantial portion of her day. Lastly, with regard to this issue, the ALJ

did not rely solely on Pope's activities of daily living in finding that her allegations of disabling pain were not fully credible. Instead, he considered other factors, as stated above, including the largely benign physical examination findings, which were supported by objective medical testing, as well as the largely conservative treatment that Pope received.

Pope also argues that the ALJ erred by failing to find that her work history enhanced her credibility as to her allegations of disabling pain. Again, I am not persuaded by this argument. The Social Security Regulations do provide that "any symptom-related functional limitations and restrictions which [the claimant] … report[s], which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account. …" 20 C.F.R. § 404.1529(c)(3). Among the factors that the Commissioner will consider is a claimant's work history. *See* 20 C.F.R. § 404.1529(c)(3). However, while "a long and continuous work history may support the credibility of a testifying claimant, her admirable work history does not undermine the ALJ's credibility assessment." *Terrell v. Colvin*, 2015 WL 966256, at *13 (E.D. Va. Mar. 4, 2015). Moreover, an ALJ's mere failure to mention a claimant's work history explicitly does not warrant remand or reversal in the face of his otherwise supported findings. *See Terrell*, 2015 WL 966256, at *13 (citing *Cooper v. Astrue*, 2011 WL 6742500, at *7 (E.D. Va. Nov. 8, 2011) report and recommendation adopted by 2011 WL 6749018 (E.D. Va. Dec. 22, 2011)). In short, a claimants' work history, standing alone, is insufficient to contravene an ALJ's credibility finding. *See Cooper*, 2011 WL 6742500, at *7 (citing *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998); *Laws v. Astrue*, 2009 WL 3270770, at *6 (E.D. Va. Oct. 8, 2009)). Here, as previously stated, the ALJ based his credibility finding on the record evidence as a whole, including Pope's activities of daily living, inconsistencies between her testimony and the medical treatment notes and the objective medical testing. I further find

that, even though the ALJ did not explicitly address the correlation between Pope's work history and her credibility, the ALJ was well aware of her work history, as he developed the evidence of such with both Pope and the vocational expert during the hearing. (R. at 33-34, 48-49, 187-94.)

For all of these reasons, I find that the ALJ properly utilized the two-prong test for analyzing Pope's credibility regarding her subjective allegations of pain.

I also find unpersuasive Pope's argument that the ALJ should have accorded greater weight to the opinion of her treating physician, Dr. Shamiyeh, instead of relying on the opinions of the nonexamining state agency physicians in arriving at his finding that she could perform a range of light work. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(c)(2) (2015). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig*, 76 F.3d at 590 (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

In this case, the ALJ gave no weight to the March 8, 2012, physical assessment of Pope completed by Dr. Shamiyeh. In that assessment, Dr. Shamiyeh opined that Pope could perform less than sedentary work, including the performance of no reaching, handling, fingering, feeling or pushing/pulling and that she must lie down four to five times during an eight-hour day. (R. at 680-83.) Dr. Shamiyeh stated that these restrictions were based on Pope's carpal tunnel syndrome, low back pain, upper extremity weakness and cervical stenosis. The

ALJ explained that he was giving no weight to this opinion because he found it inconsistent with objective medical testing, including nerve conduction studies revealing only mild bilateral carpal tunnel syndrome and no evidence of radiculopathy, as well as a cervical myelogram and CT scan which showed excellent progression of the C5-C6 fusion and no impingement on the C6-C7 nerve root. (R. at 19-20.) The ALJ further found such opinions inconsistent with Pope's physical examinations, which were essentially normal, except for some decreased cervical range of motion, only moderate cervical paraspinous muscle contractions, 5- strength in the right upper extremity with normal muscle tone and no atrophy and 5+ strength in the lower extremities and left upper extremity with normal tone and no atrophy, but full range of motion of the upper and lower extremities and no misalignment, tenderness, deformities or effusion. (R. at 19-20.) The ALJ further noted that Dr. Shamiyeh's opinion was inconsistent with his own February 2012 treatment note, indicating that he did not diagnose carpal tunnel syndrome, upper extremity weakness or cervical stenosis, and his March 2012 treatment note, indicating that Pope had full range of motion of the upper and lower extremities and neck without neck tenderness, as well as negative straight leg raise testing bilaterally. (R. at 20.)

The ALJ explained in his decision that he was giving some weight to the opinions of the state agency physicians, who opined that Pope was only mildly limited in her activities of daily living and could perform a limited range of light work. (R. at 19.) Such findings are consistent with the record evidence as a whole, as discussed herein.

While Pope argues that the ALJ should have obtained a physical assessment from a treating or consulting source, I find this argument to be without merit. Although the ALJ has a duty to develop the record, *see Cook v. Heckler*, 783 F.2d

1168, 1173 (4th Cir. 1986), the Regulations require only that the medical evidence be "complete" enough to make a determination regarding the nature and effect of the claimed disability, the duration of the disability and the claimant's residual functional capacity.  *See* 20 C.F.R. § 404.1513(e) (2015).  I find that the ALJ in this case had more than enough medical evidence to render his residual functional capacity finding and ultimate disability determination.

For all of the above-stated reasons, I find that the ALJ's weighing of the medical evidence is supported by substantial evidence, as is his finding that Pope could perform a range of light work.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's credibility determination regarding Pope's allegations of disabling pain;

2. Substantial evidence exists in the record to support the ALJ's weighing of the medical evidence;

3. Substantial evidence exists in the record to support the ALJ's finding with regard to Pope's residual functional capacity; and

4. Substantial evidence exists in the record to support the Commissioner's finding that Pope was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court grant the Commissioner's

motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2015):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     March 8, 2016.

s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE